# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

MARK LAYMON                                                    PLAINTIFF


V.                              NO. 4:08CV00502 JTR


MICHAEL J. ASTRUE,
Commissioner, Social
Security Administration                                       DEFENDANT


## MEMORANDUM AND ORDER

### I.  Introduction

Plaintiff, Mark Laymon, has appealed the final decision of the Commissioner of the Social

Security Administration (the  "Commissioner") denying his claim for Disability Insurance Benefits

("DIB") and Supplemental Security Income ("SSI").   Both parties have filed Appeal Briefs (docket

entries #10 and #11), and the issues are now joined and ready for disposition.

The Court's function on review is to determine whether the Commissioner's decision is

supported by substantial evidence on the record as a whole and whether it is based on legal error.

*Long v. Chater,* 108 F.3d 185, 187 (8th Cir. 1997); *see also* 42 U.S.C. § 405(g).  While "substantial

evidence" is that which a reasonable mind might accept as adequate to support a conclusion,[1]

"substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing

analysis:

> "[O]ur review is more than an examination of the record for the existence of
> substantial evidence in support of the Commissioner's decision; we also take into
> account whatever in the record fairly detracts from that decision."   *Haley v.*

---

[1] *Reynolds v. Chater*, 82 F.3d 254, 257 (8th Cir. 1996).

> *Massanari*, 258 F.3d 742, 747 (8th Cir. 2001).  Reversal is not warranted, however,
> "merely because substantial evidence would have supported an opposite decision."
> *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995).

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005).

On August 3, 2005, Plaintiff filed applications for DIB and SSI, alleging disability since May 15, 2005.  (Tr. 54, 202.)  According to Plaintiff, he was disabled due to diabetes, glaucoma, headaches, concentration problems, and sleep problems.  (Tr. 45.)  After Plaintiff's claims were denied at the initial and reconsideration levels, he requested a hearing before an Administrative Law Judge ("ALJ").  On January 23, 2007, the ALJ conducted an administrative hearing, where Plaintiff and a vocational expert ("VE") testified.  (Tr. 216-40.)

At the time of the administrative hearing, Plaintiff was 36-years old, and had a high-school education.  (Tr. 221.)  His past relevant work included a job for ten years as a licensed boiler operator.  (Tr. 222, 225 .)

The ALJ considered Plaintiff's impairments by way of the familiar five-step sequential evaluation process.  Step 1 involves a determination of whether the claimant is involved in substantial gainful activity ("SGA"). 20 C.F.R. § 404.1520(a)(4)(I) (2005), §416.920. If the claimant is, benefits are denied, regardless of medical condition, age, education, or work experience. *Id.*, § 404.1520(b), § 416.920.

Step 2 involves a determination, based solely on the medical evidence, of whether the claimant has an impairment or combination of impairments which significantly limits claimant's ability to perform basic work activities, a "severe" impairment.  *Id.*, § 404.1520(4)(ii), § 416.920. If not, benefits are denied.  *Id.*

Step 3 involves a determination, again based solely on the medical evidence, of whether the

severe impairment(s) meets or equals a listed impairment which is presumed to be disabling. *Id.*, §
404.1520(a)(iii), § 416.920.[2]  If so, and the duration requirement is met, benefits are awarded.  *Id.*

Step 4 involves a determination of whether the claimant has sufficient RFC, despite the
impairment(s), to perform the physical and mental demands of past relevant work.  *Id.*, §
404.1520(4)(iv), § 416.920.  If so, benefits are denied.  *Id.*

Step 5 involves a determination of whether the claimant is able to make an adjustment to
other work, given claimant's age, education and work experience. *Id.*, § 404.1520(4)(v), § 416.920.
If so, benefits are denied; if not, benefits are awarded.  *Id.*

In his June 8, 2007 decision, the ALJ found that Plaintiff: (1) met the Act's insured status
requirements; (2) had not engaged in substantial gainful activity since the alleged onset date; (3) had
"severe" impairments consisting of mood disorder NOS, diabetes mellitus, glaucoma, and a
substance abuse disorder; (4) did not have an impairment or combination of impairments that met
or equaled a Listing; (5) was not entirely credible; (6) had a combination of impairments, including
a substance disorder, resulting in a "limited but satisfactory" ability regarding simple work
instructions, work-related decisions, interaction with the public and co-workers, "severe" limitations
with regard to detailed instructions and responding appropriately to changes in a routine work
setting, and "no useful ability" to respond appropriately to usual work pressures; (6) was unable to
perform his past relevant work, because it was skilled work; (7) could not perform other unskilled
jobs in the national economy, based on his inability to respond to work pressures, and was therefore
disabled; (8) did not have a combination of impairments meeting a Listing "if Plaintiff stopped the

---

[2]If the claimant's impairments do not meet or equal a Listing, then the ALJ must determine
the claimant's residual functional capacity ("RFC") based on all the relevant medical and other
evidence.  *Id.*, § 404.1520(e).  This RFC is then used by the ALJ in his analysis at Steps 4 or 5.  *Id.*

substance abuse"; (9) had the mental RFC to perform unskilled work if Plaintiff "stopped the substance abuse"; (10) could not return to his past relevant work if Plaintiff "stopped the substance abuse"; but (11) could perform other work in the national economy if Plaintiff "stopped the substance abuse." (Tr. 17-25.)   Thus, the ALJ concluded that Plaintiff was not disabled. (Tr. 26.)

On April 11, 2008, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making it the final decision of the Commissioner. (Tr. 3-5.) Plaintiff then filed his Complaint appealing that decision to this Court. (Docket entry #2.)

## II.  Analysis

In Plaintiff's Appeal Brief (docket entry #8), he argues that the ALJ erred: (1) in failing to adequately develop the record regarding Plaintiff's sleep apnea; (2) in failing to find that Plaintiff's migraines and foot pain were Step 2 "severe" impairments; (3) in finding that Plaintiff's substance abuse disorder was a Step 2 "severe" impairment; (4) in finding that Plaintiff did not meet a Listing; (5) in analyzing Plaintiff's credibility; (6) in determining Plaintiff's mental RFC; and (7) in his analysis of Plaintiff's alcoholism and drug abuse as it related to his claim for disability.

Because Plaintiff's two final arguments, *taken together*, have merit, the Court concludes that the Commissioner's decision must be reversed and remanded for further administrative proceedings. Finally, because the issue may come up on remand, the Court will also address Plaintiff's Listing argument.

## A.    Hearing Testimony and Medical Evidence

From 1995 through 2005, Plaintiff was a licensed boiler operator at Superior Graphite, and he operated five ovens that baked carbon and graphite. (Tr. 222, 225.)  Plaintiff would "start them up, take care of them during a bake cycle," and then shut them down. (Tr. 222.)  Plaintiff testified

that this job ended after his employer attempted to train him "on new stuff" and he "could not remember half the stuff they told him."  (Tr. 236.)

Plaintiff then attempted work as a stocker at Wal-Mart, but he could not be "around people" and could not "remember stuff." (Tr. 223.)  Plaintiff described getting anxious "around new people," and could not keep up with the tags and numbers.  (Tr. 225.) Plaintiff also felt depressed, but could not afford medication for depression.  (Tr. 226.)

Plaintiff took medication for diabetes, which was controlled.  His feet hurt and his toes were numb.  This caused him problems walking.  (Tr. 228.)  He took anti-inflammatories and muscle relaxers for back pain, which had improved.

Plaintiff had glaucoma with blurry and worsening vision.  He also described having migraine headaches on a monthly and, sometimes, weekly basis.  He felt tired and sleepy, and believed he had sleep apnea.

Plaintiff had memory problems and "zoned out."  He also described having suicidal ideation.

Plaintiff was asked the following questions about his alcohol and drug use:

Q:  At one time you drank a lot?

A:  Yes, sir.  I used to drink real heavy.

Q:  Do drugs or anything like that?

A:  Yes, sir.

Q:  How long has it been since you've drank a lot or drank or done illegal drugs, Mark?

A:  I probably quit drinking about six years ago.

Q:  What about the drugs?

A:  That's probably been about four years ago.

(Tr. 233-34.)

On April 23, 2004, Dr. Charles Young diagnosed Plaintiff with moderately controlled glaucoma.  (Tr. 143.)  On May 5, 2005, Plaintiff saw Dr. Finley Turner for left foot pain.  (Tr. 148.) An x-ray was negative and Plaintiff was diagnosed with a foot hematoma.  (Tr. 148.)

On October 6, 2005, Plaintiff was seen by psychologist Steve Shry for a consultative psychological examination. (Tr. 151-155.)   Dr. Shry estimated that Plaintiff's IQ was in the borderline range.  (Tr. 153.)  Although Plaintiff appeared to have impairment in short-term memory, Dr. Shry did not have enough background or history to make a diagnosis.  (Tr. 153.)  Regarding Plaintiff's cognition, Dr. Shry stated:

> Claimant appears to be functioning within at least Borderline Ranges intellectually. He has difficulties in short term memory. Whether or not claimant is impaired in two or more areas of adaptive functioning appears to be a medical decision. Given the claimant's difficulties driving, due to visual difficulties, reliable employment may become a difficulty. Claimant needs medical attention.

(Tr. 154.)

On October 10, 2005, Plaintiff underwent a consultative physical examination from Dr. John Dobbs.  (Tr. 156-62.)  Plaintiff's physical, orthopedic, extremities, neurological, and limb function examinations were normal.  (Tr. 158-61.)  Dr. Dobbs diagnosed: (1) daytime drowsiness; (2) diabetes mellitus; and (3) glaucoma, by history.  (Tr. 162.)  Dr. Dobbs found Plaintiff to have "no specific limitations."  (Tr. 162.)

On October 14, 2005, Plaintiff was seen by Richard Hendrickson, M.D. for a consultative visual examination.  (Tr. 163-65.) Plaintiff's intraocular pressure was 46 mm in the right eye and 38 mm in the left eye (normal range 21 mm or less.) (Tr. 163.)  Dr. Hendrickson wrote that, if Plaintiff did not lower his pressures with medication, he would lose vision over the years and could

eventually go blind.  (Tr. 163.)

On September 30, 2006, Plaintiff returned to Dr. Shry for a second consultative psychological evaluation (Tr. 180-87.)  Plaintiff admitted to a long history of alcohol abuse.  Plaintiff stated that he "drank whiskey real heavy for years. I've been in several car accidents, and in some of them I hit my head and ended up passing out." According to Plaintiff, he stopped drinking "six years ago I don't drink anymore, but it used to be pretty bad." He also admitted to four past DWIs and several car wrecks where he hit his head and passed out. (Tr. 180)

On the Wechsler Adult Intelligence Scale III, Plaintiff scored a Verbal IQ of 68, a Performance IQ of 68, and a Full Scale IQ of 65 (Tr. 181.) These scores placed Plaintiff "within the mildly mentally retarded range of current intellectual functioning." (Tr. 181.) Plaintiff's results on the Minnesota Multiphasic Personality Inventory ("MMPI-2") were invalid due to an "extremely high F scale of T over 100 and a quite low K scale of T= 30."   Plaintiff's results on the Beck Anxiety Inventory placed him the moderate to severe range of anxiety, and his results on the Beck Depression  Inventory placed him in the severe range of depression.

Dr. Shry's diagnostic impressions were: (1) major depression; and (2) rule out cognitive disorder, NOS.  (Tr. 182.)  Dr. Shry's conclusion was as follows:

> Claimant is currently functioning within the upper end of mild mental retardation on the Wechsler Intelligence Scale. There is a significant difference between his Achievement Test scores (with reading at high school level) and I.Q. level, suggesting that claimant is likely to have a residual learning disability, possibly with cognitive disorder (as noted in previous examination by examiner 10/06/05). Given claimant's history of "heavy drinking" and reported numerous accidents (some of which involved a loss of consciousness), there could be some organicity tied into the discrepancies between intellectual level and Achievement Test scores. The claimant appeared to have some impairment in short-term memory that he cites as worsening over the past year. Given claimant's problems physically, including glaucoma, diabetes, and sleep apnea, coupled with his depressive state, it is doubtful that

claimant could maintain reliable employment at the present time. Although claimant scores at the Upper End of Mild Mental Retardation, examiner believes that he is functionally somewhat higher than the score indicates, particularly in view of the discrepancy between his Achievement Test Scores and his adaptive functioning level as indicated by interview. Claimant appears capable of managing his own funds. He expresses a desire to eventually return to work if he is physically able. Claimant needs medical intervention in order to treat his depression and the physical problems noted above.

(Tr. 183.)

Dr. Shry completed a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)." He found that Plaintiff had "moderate" limitation in the ability to understand and remember simple instructions, "slight" limitation in the ability to carry out simple instructions, "marked" limitation in the ability to understand, remember, and carry out detailed instructions, and "moderate" limitation in the ability to make judgments on work-related decisions. (Tr. 185.) In support of these findings, Dr. Shry cited Plaintiff's IQ scores and his interview. (Tr. 185.)

Dr. Shry also assessed Plaintiff as having "moderate" limitation in the ability to interact with the public, supervisors, and co-workers; "extreme" limitation in responding to usual work pressures; and "marked" limitation in the ability to respond to changes in a routine work setting. (Tr. 186.) In support of these findings, Dr. Shry cited Plaintiff's "major depression" with "significant memory, sleep and visual problems." (Tr. 186.)

The form Dr. Shry completed also included the following question: "If the claimant's impairment(s) include alcohol and/or substance abuse, do these impairments contribute to any of the claimant's limitations as set forth above? If so, please list the specific limitations caused." Dr. Shry answered that Plaintiff "has a history of substance abuse including four DWIs and a number of accidents some of which involved loss of consciousness." (Tr. 186.) This was followed with the

8

question: "If you have concluded that the medical record indicates that the claimant's alcohol and/or substance use/abuse contributes to any limitations as set forth above, please identify and explain what changes you would make to your answers if the claimant was totally abstinent from alcohol and/or substance use/abuse."  Dr. Shry's answer was:  "His reported memory deficits."  (Tr. 187.)

On November 20, 2006, Plaintiff's lawyer referred him to Counseling Associates, Inc.  (Tr. 192.)  Plaintiff's stated problems were irritability, being easily distracted, mood swings, sleep difficulty, and anxiety related to social situations.  (Tr. 197.)  Plaintiff reported wanting to "calm down and cheer up."  (Tr. 197.)  Plaintiff stated that he had "more fun" when he was drinking, but he had no current desire to drink.  Plaintiff also reported alcohol, marijuana, and meth use "but not as heavy/frequent as 5 years ago."  (Tr. 189, 197.)

On an "Adult Diagnostic Assessment," Plaintiff's "alcohol/drug history" was characterized as follows: (1) alcohol, age of first use — 16, date of last use April 2006, frequency 1-2 times a year during last 5 years, amount — "too much"; (2) marijuana, age of first use — 9, date of last use — June 2006, frequency — 1 time a year during last five years, amount — 1 joint; (3) meth/acid/LSD, age of first use — 24, date of last use — 2003, frequency 1 time a week, amount — ½ gram a month. (Tr. 194.)  Plaintiff also reported that his brother was an alcoholic and alcoholism was "prevalent" on his father's side of the family.  (Tr. 195.)  Plaintiff was diagnosed with: (1) mood disorder NOS rule out social phobia;  (2) polysubstance abuse/dependence; and (3) glaucoma.[3]  (Tr. 189, 197.) Plaintiff's GAF was 51.  (Tr. 197.)  Plaintiff was recommended for individual therapy and a psychiatric evaluation.  (Tr. 197.)

---

[3]It appears that the Counseling Associates forms were completed by an "intern" and another supervisor who was a licensed professional counselor ("LPC").  (Tr. 191.)

Plaintiff returned to Counseling Associates on November 28, 2006 and reported feeling better but having increased anxiety due to his upcoming disability hearing. (Tr. 201.) Plaintiff's GAF was 52. (Tr. 201.) On December 4, 2006, Plaintiff reported that things were going well but that he had increased headaches. (Tr. 199.) Plaintiff's GAF was 52. (Tr. 199.)

**B.     The ALJ's Drug or Alcohol Addiction Analysis**

Plaintiff argues that, after he found Plaintiff to be disabled at step 5, he should *not* have engaged in the regulatory drug or alcohol addiction ("DAA") analysis, which led to him concluding that Plaintiff was *not* disabled. According to Plaintiff, the medical evidence established that he had a history of drug and alcohol abuse, but did *not* establish that he had a *current problem* with alcohol or drugs during the relevant time frame in this case. According to Plaintiff, there was insufficient evidence to establish either a Step 2 "severe" impairment or to warrant the DAA analysis.

In *Brueggmann v. Barnhart*, 348 F.3d 689 (8th Cir. 2003), the Court explained the regulatory procedure that an ALJ must follow in cases in which alcohol and substance abuse disorder are a contributing factor to a claimant's other serious limitations. First, the ALJ must determine if the claimant is disabled using the standard five-step approach set forth in 20 C.F.R. § 404.1520, "without segregating out any effects that might be due to substance abuse disorders." *Brueggmann*, 348 F.3d at 694. If the claimant is disabled, "the ALJ must next consider which limitations would remain when the effects of the substance use disorders are absent." *Id.* at 694-95. "Only after the ALJ has made an initial determination 1) that [the claimant] is disabled, 2) that drug or alcohol use is a concern, and 3) that substantial evidence on the record shows what limitations would remain in the absence of alcoholism or drug addiction, may he then reach a conclusion on whether [the claimant's] substance use disorders are a contributing factor material to the determination of

disability." *Id.* at 695.

The burden of proving that substance abuse was *not* a "contributing factor material to the disability determination" falls on the claimant. *Id.* at 693. If the ALJ "can not determine whether substance use disorders are a contributing factor material to the claimant's otherwise-acknowledged disability, the claimant's burden has been met and an award of benefits must follow." *Id.*

While the Court in *Brueggmann* made it clear that the DAA analysis is warranted where substance abuse "is a concern," it did not elaborate on the level or degree of the substance abuse necessary to trigger the analysis after a "standard" five-step finding of disability.[4]  The Social Security Administration's Program Operation Manual System ("POMS")[5] § DI 90070.050 provides that, if a claimant is found to be disabled, then a decision must be made as to whether there is "medical evidence of DAA."  POMS § DI 90070.050(B)(2).  "Medical evidence of DAA" means that the evidence is: (1) from an acceptable medical source; and (2) "[i]s sufficient and appropriate to establish that the individual has a medically determinable substance use disorder."  POMS § DI 90070.050(C)(1)(a).  A claimant's statement about his condition, "e.g., 'I am an alcoholic' or 'I am a drug addict'" is "considered 'evidence'" but "[n]ever sufficient to establish the existence of DAA, even   if   that   statement   is   reported   by   an   acceptable   medical   source."      POMS   §   DI

---

[4]Importantly, in *Brueggmann,* the Court was not required to consider whether the claimant had a substance abuse disorder.  After the claimant's alleged onset date, he was hospitalized multiple times with "serious mental illness" and "serious difficulties with alcohol," "at times consuming up to sixteen drinks a day."  *Brueggmann*, 348 F.3d at 692.  These facts established beyond any doubt that the claimant had a serious substance abuse disorder that was a contributing factor to the disability determination.

[5]The POMS is a "policy and procedure manual that employees of the [Social Security Administration] use in evaluating Social Security claims and does not have the force and effect of law [but] is nevertheless persuasive." *Davis v. Secretary of Health & Human Servs.*, 867 F.2d 336, 340 (6th Cir.1989).

90070.050(C)(1)(b).  Finally, "medically determinable substance use disorders" are defined as "medical conditions described as 'substance dependence' and 'substance abuse' disorders in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (the DSM-IV); i.e., conditions in which the individual's maladaptive pattern of substance use leads to clinically significant impairment or distress."     POMS § DI 90070.050(C)(1)(2).

Plaintiff claims that there was no medical evidence establishing that he had a current substance abuse disorder.  Plaintiff acknowledges that Dr. Shry's consultative psychological examinations recite a history of substance abuse, but he contends that Dr. Shry stopped short of diagnosing Plaintiff with a substance abuse disorder.  While Plaintiff concedes that the November 20, 2006 Counseling Associates record diagnosed him with "polysubstance abuse/dependence," he contends that this diagnosis was based solely on his own admission of  "drinking and smoking marijuana once or twice a year."  (Docket entry #10, *Pltf's App. Brf.* at 18-19.)

In his Appeal Brief, the Commissioner argues that substantial evidence supported the ALJ's determination that substance abuse by Plaintiff was a "concern."  In support of this contention, the Commissioner cites the following evidence: (1) on November 20, 2006, Counseling Associates diagnosed Plaintiff with "polysubstance abuse/dependence;" (2) Plaintiff admitted using alcohol and marijuana since April and June of 2006 "although not as heavy/frequent as five years ago"; and (3) Dr. Shry expressed the opinion that Plaintiff had memory deficits due to his history of heavy drinking, including 4 DWIs.[6]  (Docket entry #11, *Dft's App. Brf.* at 8-9.)

According to Plaintiff, the Counseling Associates diagnosis of "polysubstance

---

[6]In finding that Plaintiff had problems with his memory, Dr. Shry noted that Plaintiff's "reported memory deficits" might improve if he was abstinent from alcohol or drug use.  (Tr. 187.) This strongly suggests that Plaintiff's *current* substance abuse was a "concern."

abuse/dependence" was based only on one or two "slip ups" or "relapses." Regardless of how those

uses are characterized, when they are combined with Plaintiff's acknowledged history of heavy

drinking and a strong family history of alcoholism, there was sufficient evidence to establish "that

drug or alcohol use is a concern." *See Brueggmann*, 348 F.3d at 694. Thus, the Court concludes that

the ALJ did not err in concluding that "substance abuse disorder" was a Step 2 "severe" impairment,

or that performing a DAA analysis was warranted.

**C.     The ALJ's Determination Of Plaintiff's Mental RFC**

In the ALJ's standard five-step analysis, he concluded that Plaintiff had the following mental

RFC:

> [B]ased on all the impairments, including the substance use disorders, the claimant
> is limited but satisfactory with regard to simple instructions; limited but satisfactory
> on the ability to make simple work-related decisions; limited but satisfactory in
> dealing with the public, supervisors, and co-workers; severely limited (can only
> perform occasionally) with regard to detailed instructions and the ability to respond
> appropriately to changes in a routine work setting. *The claimant would have no
> useful ability in the area of responding appropriately to work pressures in a usual
> work setting.*

(Emphasis added.)  (Tr. 17.)  The ALJ incorporated this mental RFC in a hypothetical question to

the VE.  The VE responded that the hypothetical claimant's inability to respond to work pressures

was a disabling limitation and that no medium, unskilled jobs would be available for such a person:

> A: Your honor, the jobs that I gave you are medium, unskilled jobs but they do require
> production and production of certain numbers and if someone was not able to respond to
> work pressures, I would feel someone would be felt pressured to produce certain limits or
> they'd lose their job —
>
> Q: Okay.
>
> A: As if there is, if they cannot respond to that, I wouldn't think they'd be able to do an
> unskilled job.

Q: No jobs available?

A: No jobs if that's no, no ability to function in that area at all.

(Tr. 238-39.)

At step 5, the ALJ relied on this testimony from the VE to find that "an individual that was unable to respond to work pressures could not perform an unskilled job."  (Tr. 23.)  However, the ALJ went on to find that, *if Plaintiff "stopped the substance abuse,"* he would retain the mental RFC for unskilled work.  Thus, the ALJ concluded that alcohol and substance abuse was a "contributing factor material to the disability."  (Tr. 25-26.)

The crux of the ALJ's decision was that Plaintiff had a severe limitation in responding to work pressures, which meant he lacked the mental RFC for unskilled work.  While the ALJ did not explain the evidentiary basis for this finding, he *must have* adopted it from Dr. Shry's September 30, 2006 "Medical Source Statement of Ability to Do Work-Related Activities (Mental)," because it is the *only evidence in the medical record* supporting this limitation.

As indicated earlier, Dr. Shry concluded that Plaintiff had "extreme" limitation in the ability to respond appropriately to work pressures in a usual work setting.  (Tr. 186.)  However, *nothing* in Dr. Shry's report suggests that this extreme limitation was related to Plaintiff's alcohol or substance abuse.  Rather, Dr. Shry cited Plaintiff's  "major depression" with "significant memory, sleep and visual problems" as the causes for this limitation.  (Tr. 186.)

Dr. Shry did indicate that a component of Plaintiff's *memory loss* was possibly related to substance abuse.  (Tr. 186.)  When he was asked on the form if his assessment of any of Plaintiff's limitations would "change," if Plaintiff was "totally abstinent" from alcohol,  Dr. Shry wrote "his

reported memory deficits."[7]  (Tr. 187.)  In short, *nothing* in Dr. Shry's report or anywhere else in the

record supports the ALJ's conclusion that, if Plaintiff "stopped the substance abuse," his inabiliy to

respond to work pressure would somehow improve to the point that he could perform unskilled

work.[8]

While Dr. Shry's report is not a picture of clarity, he does make it clear that Plaintiff's

extreme limitation in dealing with work place pressure stems from his major depression and

"significant memory, sleep, and visual problems."  (Tr. 186.)  He makes no mention of Plaintiff's

substance abuse affecting his ability to deal with work place pressure.[9]  Thus, there is no evidence

in the record to support the ALJ's crucially important finding that, if Plaintiff "stopped the substance

abuse," he would be able to respond to work pressure sufficiently to perform an unskilled job.

**D.    Plaintiff's Listing Argument**

Plaintiff was administered an IQ test by Dr. Shry.  The results of that test were as follows:

verbal IQ 68; performance IQ 58; and Full Scale IQ 65.  (Tr. 181.)  Dr. Shry  opined that the IQ

scores were valid, but thought that Plaintiff was "functionally somewhat higher than the score

---

[7]Earlier in Dr. Shry's report, he raised the possibility that Plaintiff's reported car crashes, with loss of consciousness, may have caused some organic brain damage.  (Tr. 182.)  However, Dr. Shry's opinion that Plaintiff's reported memory loss might change if he was abstinent from substance abuse suggests that some component of Plaintiff's memory loss was from *current* substance abuse.

[8]Ironically, the ALJ specifically discounted Dr. Shry's opinion that Plaintiff "could not maintain reliable employment at the present time."  (Tr. 22.)  In doing so, the ALJ observed that Dr. Shry's opinion mentioned a long history of alcohol abuse, but gave "no assessment of whether the conclusion is or is not affected by alcohol abuse."  (Tr. 22.)

[9]As indicated earlier, Dr. Shry stated that only "memory loss" would be affected by Plaintiff's substance abuse.  While memory problems, along with three other *unrelated problems*, were cited by Dr. Shry as the causes for Plaintiff's extreme limitation in dealing with work place pressure, this falls far short of substantial evidence to support the ALJ's finding that, if Plaintiff stopped the substance abuse, he would retain the mental RFC for unskilled work.

indicates, particularly in view of the discrepancy between his Achievement Test scores and his adaptive functioning level as indicated by interview." (Tr. 183.) The ALJ discounted these IQ scores in his Listing analysis and noted that they "should be consistent with the developmental history and degree of functional limitation[.]" (Tr. 17.)

Plaintiff argues that the ALJ erred in his Listing analysis because he rejected Plaintiff's valid IQ scores which placed Plaintiff in the range of Listing 12.05C.[10] However, the Eighth Circuit has recognized that "there are times when IQ scores that fall within listing ranges can be rejected." *See Christner v. Astrue*, 498 F.3d 790 (8th Cir. 2007). In *Miles v. Barnhart*, 374 F.3d 694, 699 (8th Cir. 2004), the Court held that an otherwise-valid IQ score may be discounted where the claimant's education, daily activities, and work history "call into question the validity of the IQ results." *Id. (quoting Bailey v. Apfel*, 230 F.3d 1063 (8th Cir.2000)). In *Miles* the ALJ properly discounted an otherwise-valid IQ score of 59 because the claimant had no problem communicating at the administrative hearing, attended regular classes in high school with B grades, completed a vocational training program, passed a driver's license examination, had driven a car, had lived independently, and had never been terminated from a job for lack of mental ability, but had been terminated because of lack of transportation or lack of work.

---

[10]Listing 12.05 defines mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.05. A claimant is considered mentally retarded if she meets one of four sets of criteria under Listing 12.05, one of which is "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]" 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.05C. (2006). The Eighth Circuit has characterized the three requirements of Listing 12.05C as follows: "(1) a valid verbal, performance, or full scale IQ of 60 through 70; (2) an onset of the impairment before age 22; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006).

In this case, Dr. Shry concluded that Plaintiff was likely functioning at a higher level than the upper mild mental retardation range indicated by his IQ scores.  Dr. Shry's conclusion is strongly supported by other evidence, *i.e.*, Plaintiff obtained a high school diploma and performed *skilled work* for ten years as a licensed boiler operator.  Under these circumstances, the Court concludes that substantial evidence supported the ALJ's decision to discount Plaintiff's IQ scores in his Listing analysis.

### III.  Conclusion

On remand, the ALJ should carefully update the medical record, and ensure that he obtains, considers, and discusses all of the medical evidence relevant to his determination of Plaintiff's RFC. He also should ensure that, in evaluating whether Plaintiff's drug or alcohol abuse is a contributing factor material to the determination of disability, he complies with all of the requirements of *Brueggmann*.

IT IS THEREFORE ORDERED THAT the Commissioner's decision is reversed and this matter is remanded to the Commissioner for further proceedings pursuant to "sentence four," within the meaning of 42 U.S.C. § 405(g) and *Melkonyan v. Sullivan*, 501 U.S. 89 (1991).

DATED this 16th day of September, 2009.

_____
UNITED STATES MAGISTRATE JUDGE